# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---

|  |  |
|---|---|
| KEENAN M. SCOTT, THOMAS LOGAN, JOHN LOOMIS, ROBERT DAVIDSON, and MICHAEL C. DEMARTINO, et al., | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 02 CV 9530 (SAS) ) |
| CITY OF NEW YORK and THE NEW YORK CITY POLICE DEPARTMENT, | ) ) ) |
| Defendants. | ) ) ) |

---

## PLAINTIFFS' APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

Thomas P. Puccio
LAW OFFICES OF THOMAS P. PUCCIO
230 Park Avenue
New York, NY 10169
(212) 883-6383

Gary A. Orseck
Lawrence S. Robbins
Damon W. Taaffe
ROBBINS, RUSSELL, ENGLERT,
 ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411
Washington, D.C. 20006
(202) 775-4500

Will Aitchison
AITCHISON & VICK, INC.
3021 N.E. Broadway
Portland, OR 97232
(503) 282-6160

*Counsel for Plaintiffs*

Date:   June 30, 2009

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      THE COURT SHOULD AWARD PLAINTIFFS THE FEES REQUESTED BY
        THEIR ATTORNEYS AT THEIR HOURLY RATES. . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.      The FLSA Provides For Mandatory Attorney's Fees For Prevailing
                Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.      Application Of The Test Adopted By The Second Circuit Confirms
                The Reasonableness Of Plaintiff's Fee Request. . . . . . . . . . . . . . . . . . . . . . 5

                1.      The time and labor required. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

                        a.      Communications with 15,000 clients. . . . . . . . . . . . . . . . . 6

                        b.      Defeating    defendants'    initial
                                dispositive motions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                        c.      The survey and motion practice before
                                Magistrate Judge Katz. . . . . . . . . . . . . . . . . . . . . . . . . . 6

                        d.      Document and deposition discovery. . . . . . . . . . . . . . . . . 8

                        e.      Summary judgment motions. . . . . . . . . . . . . . . . . . . . . . 11

                        f.      The trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                2.      The novelty and difficulty of the questions. . . . . . . . . . . . . . . . . . 13

                3.      The level of skill required to perform the legal service
                        properly. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                4.      The preclusion of employment by the attorney due to
                        acceptance of the case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

i

5.      The attorney's customary hourly rate.............................. 15

6.      Whether the fee is fixed or contingent............................ 16

7.      The time limitations imposed by the client or the circumstances............................................... 16

8.      The amount involved in the case and the results obtained....................................................... 16

9.      The experience, reputation, and ability of the attorneys ............................................................ 19

10.     The undesirability of the case. ................................... 21

11.     The nature and length of the professional relationship with the client............................................. 21

12.     Awards in similar cases........................................ 21

II.     THE COURT SHOULD AWARD PLAINTIFFS THEIR COSTS.................. 22

CONCLUSION............................................................. 23

## TABLE OF AUTHORITIES

**Cases:**                                                                      **Page(s)**

*Arbor Hill Concerned Citizens Neighborhood Ass'n* v. *County of Albany and
    Albany Bd. of Elections*, 522 F.3d 182 (2d Cir. 2008)............................. *passim*

*Ayres* v. *127 Restaurant Corp.*, No. 96 Civ. 1255,
    1999 WL 328348 (S.D.N.Y. May 21, 1999). ................................... 17

*Barfield* v. *New York City Health and Hospitals Corp.*,
    No. 05 Civ. 6319 (JSR), 2006 WL 2356152 (S.D.N.Y. Aug. 11, 2006)........... 1, 19

*Cho* v. *Koam Medical Services P.C.*, 524 F. Supp. 2d 202 (E.D.N.Y. 2007). ............... 4

*City of Burlington* v. *Dague*, 505 U.S. 557 (1992). ................................... 17

*City of Riverside* v. *Rivera*, 477 U.S. 461 (1986). ................................... 18

*Clarke* v. *One Source, Inc.*, No. 99 Civ. 2323 (RPP),
    2002 WL 31458238 (S.D.N.Y. Nov. 1, 2002)................................ 17, 19

*Cowan* v. *Prudential Ins. Co. of America*, 935 F.2d 522 (2d Cir. 1991).................... 18

*Gordon* v. *Camp Canine, Inc.*, No. 02 Civ. 4093 (SAS)(JCF),
    2003 WL 1563288 (S.D.N.Y. March 25, 2003). ............................. 17

*Grant* v. *Martinez*, 973 F.2d 96 (2d Cir. 1992). ................................ 15, 17, 18

*Heng Chan* v. *Sung Yue Tung Corp.*, No. 03 Civ. 6048 (GEL),
    2007 WL 1373118 (S.D.N.Y. May 8, 2007). .................................. 3

*Heitmann* v. *City of Chicago*, 560 F.3d 642 (7th Cir. 2009)............................ 14

*Hensley* v. *Eckerhart*, 461 U.S. 424 (1983)...................................... 5, 17

*Houston Police Officers' Union* v. *City of Houston*, 330 F.3d 298 (5th Cir. 2003). .......... 14

*In re Painewebber Ltd. Partnerships Litigation*,
    No. 94 Civ. 8547 (SHS), 2003 WL 21787410 (S.D.N.Y. Aug. 4, 2003). ............ 15

*In re TOUSA, Inc.*, No. 08-10928-JKO (S.D. Fl.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Johnson* v. *Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). . . . . . . . . . . . . . . . *passim*

*Lunday* v. *City of Albany*, 42 F.3d 131 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . 2, 17, 18

*Miele* v. *New York State Teamsters Conf. Pension & Retirement Fund*,
       831 F.2d 407 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Mortensen* v. *County of Sacramento*, 368 F.3d 1082 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . 13

*New York State Ass'n for Retarded Children, Inc.* v. *Carey*,
       711 F.2d 1136 (2d Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Quaratino* v. *Tiffany & Co.*, 166 F.3d 422 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Soler* v. *G & U, Inc.*, 658 F. Supp. 1093 (S.D.N.Y. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States* v. *Donaghy*, 570 F. Supp. 2d 411 (E.D.N.Y. 2008). . . . . . . . . . . . . . . . . . . . . . . 21

**Statutes and Rules:**

29 U.S.C. § 216(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 22

42 U.S.C. § 1988. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17

29 C.F.R. § 553.25. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Plaintiffs submit this memorandum in support of their application for an award of attorneys'

fees and reimbursement of expenses related to prosecution of the case, as set forth below. Because

one of plaintiffs' counsel, Thomas Puccio, is presently in trial in another matter, he has requested,

and been granted, a brief extension for the filing of fees and expenses, which will be submitted

tomorrow.

## INTRODUCTION

Plaintiffs have succeeded in obtaining judgments on two separate claims; confirmed a theory

of liability on third; and won an award of $900,000 in damages, on behalf of more than 15,000

individual clients in a Fair Labor Standards Act case of unprecedented scope and challenge. The

case – which has been pending for more than six years – is the largest ever brought against a

municipality under the FLSA, and presented many complex and difficult legal issues of first

impression. As described below, success on these claims was anything but guaranteed, and every

aspect of the case has been vigorously contested by defendants from start to finish.

Section 216(b) of the FLSA, 29 U.S.C. § 216(b), provides that, upon a finding of liability

under Sections 206 or 207, "[t]he court * * * *shall*, in addition to any judgment awarded to the

plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the

action." (Emphasis added.) Under that fee-shifting provision, plaintiffs seek $4,849,171.50 in fees

for attorneys from Robbins, Russell, Englert, Orseck, Untereiner & Sauber, LLP ("Robbins

Russell"), and Aitchison & Vick, an amount that is plainly reasonable under the circumstances of

the case. Indeed, mindful of the FLSA's remedial purpose, courts have routinely awarded attorney

fees far in excess of the monetary judgment awarded to the individual plaintiffs. See, *e.g.*, *Barfield*

v. *New York City Health and Hospitals Corp.*, No. 05 Civ. 6319 (JSR), 2006 WL 2356152, at *3

(S.D.N.Y. Aug. 11, 2006) (awarding $887.25 in unpaid wages, $887.25 in liquidated damages, and

$49,889 in attorney's fees). Plaintiffs also seek recovery of $677,567.51 in documented costs (in addition to any costs incurred by Mr. Puccio), which includes the cost of expert witnesses and consultants, deposition and trial transcripts, travel, and related expenses. Reimbursement of these "costs of the action" is mandatory under the statute.

We acknowledge, of course, that while plaintiffs proved the defendants' willful violation of the FLSA's overtime compensation requirements (Counts III and IV), and also proved liability (although no damages) on their Forced Accrual claim (Count II) as to two individual officers, plaintiffs did not prevail on the claims alleging Denial of Use (Count I) and Failure to Pay (Count V). As we explain below, however, the jury's adverse verdict on those two claims should not reduce the fees awarded because the time plaintiffs' counsel spent prosecuting them is inseparable from that dedicated to the successful claims. See *Quaratino* v. *Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999) ("fees may be awarded for unsuccessful claims as well as successful ones * * * where they are inextricably intertwined and involve a common core of facts or are based on related legal theories") (quotation marks and citation omitted); *Lunday* v. *City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994) ("So long as the plaintiff's unsuccessful claims are not 'wholly unrelated' to the plaintiff's successful claims, hours spent on the unsuccessful claims need not be excluded from the lodestar amount.") (citation omitted).

What is more, because of the manner in which the City defended the case, virtually *all* of the tasks performed by plaintiffs' counsel would have been necessary even if the counts on which we prevailed had been the only claims in the case. To take one obvious example, defendants asserted from the start that their "meal period" defense foreclosed the possibility of liability and damages on *any* of our claims. That defense, which the Court ultimately rejected at the summary judgment stage

2

six years later, was the subject of years of survey work, document discovery, and three dozen depositions, as well as extensive motion practice before Magistrate Judge Katz and this Court.

In *Arbor Hill Concerned Citizens Neighborhood Ass'n* v. *County of Albany and Albany County Bd. of Elections*, 522 F.3d 182 (2d Cir. 2008), the Court of Appeals adopted the twelve-factor *Johnson* test for determining reasonable attorneys fees.[1]  Under that test, courts should "bear in mind *all* of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate." *Id.* at 190.  Those variables, viewed both individually and collectively, confirm the reasonableness of the fees plaintiffs request here.

## ARGUMENT

## I.    THE COURT SHOULD AWARD PLAINTIFFS THE FEES REQUESTED BY THEIR ATTORNEYS AT THEIR HOURLY RATES

To facilitate the enforcement of rights it guarantees, the FLSA provides that courts must award reasonable attorney's fees along with any judgment in favor of plaintiffs.  The FLSA's fee-shifting requirement is absolute; indeed, it applies even where plaintiffs' counsel has agreed to work pro bono. *Heng Chan* v. *Sung Yue Tung Corp.*, No. 03 Civ. 6048 (GEL), 2007 WL 1373118, at *7 (S.D.N.Y. May 8, 2007) (holding, in FLSA case, that "[a]lthough the [fee] award is greater than the damages actually recovered by plaintiffs, that fact illustrates the wisdom of a fee-shifting statute that

---

[1] The twelve factors identified by the court of appeals in *Johnson* v. *Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

accounts for and rewards pro bono representation, because unprofitability is a significant disincentive for most attorneys to take cases like this one."); *Cho* v. *Koam Medical Services P.C.*, 524 F. Supp. 2d 202, 212 (E.D.N.Y. 2007) (awarding fees for pro bono representation in FLSA case). In this case, plaintiffs' attorneys have worked for more than seven years without having been paid a dime, and have succeeded in proving that defendants willfully miscalculated the regular rate of pay, and failed properly to compensate "chart" time, for at least the last ten years. The requested fees and expenses are clearly reasonable under the methodology that the Second Circuit has recently applied to fee awards

### A.    The FLSA Provides For Mandatory Attorney's Fees For Prevailing Parties

The FLSA's presumption in favor of attorney's fees for successful plaintiffs could scarcely be plainer: "The court * * * *shall*, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b) (emphasis added). That compulsory language is stronger even than provisions in other federal statutes with comparable remedial purposes, such as 42 U.S.C. § 1988(b), which provides that "the court, in its discretion, *may* allow the prevailing party * * * a reasonable attorney's fee as part of the costs" accrued in bringing civil rights claims. (Emphasis added.) Courts accordingly recognize that "the FLSA's * * * provision for the award of attorney's fees is not *permissive* but *mandatory*." *Soler* v. *G & U, Inc.*, 658 F. Supp. 1093, 1097 (S.D.N.Y. 1987).

Because plaintiffs prevailed class-wide on the Regular Rate and Chart claims, and prevailed on liability as to two individual plaintiffs on the Forced Accrual claim, the propriety of a fee award is beyond question; there remains only the question what fees are reasonable. As we explain below,

4

under the Second Circuit's approach to that question, the "reasonable fee" in this case is approximately $4.8 million for Robbins Russell and Aitchison & Vick.

### B.    Application Of The Test Adopted By The Second Circuit Confirms The Reasonableness Of Plaintiff's Fee Request

Courts have traditionally measured reasonable attorney's fees through one of two methods. See *Hensley* v. *Eckerhart*, 461 U.S. 424, 429-30 (1983). The first, called the "lodestar" method, involves two steps: (1) multiplying the attorney's usual billing rate by the number of hours worked on the case, then (2) allowing the court to adjust the resulting amount if necessary. *Id.* at 433. The second method, developed by the Fifth Circuit in *Johnson*, 488 F.2d at 717-719, involves one step in which the district court considers twelve specified factors to establish a reasonable fee. In *Arbor Hill*, the Second Circuit abandoned the pure lodestar approach, concluding that "its value as a metaphor has deteriorated to the point of unhelpfulness" (522 F.3d at 190), and embraced the twelve-factor *Johnson* test. See n.1, *supra* (listing factors).

Examination of the *Johnson* factors supports an award of the requested fees.

### 1.    The time and labor required

The *Johnson* court explained that, "[a]lthough hours claimed or spent on a case should not be the sole basis for determining a fee, they are a necessary ingredient to be considered," and the district court should consider whether the hours expended were reasonably necessary. *Id.* at 717 (internal citation omitted). We submit that the hours plaintiffs's counsel dedicated to this case are more than reasonable considering its scope and complexity, not to mention the hurdles imposed by opposing counsel's defense of the litigation. The following is a general summary of the tasks that counsel had no choice but to complete in order ultimately to prevail.

5

### a.     Communications with 15,000 clients

The first order of business for plaintiffs' counsel, starting in 2002, has been the enormous logistical task of managing, and communicating with, the individual plaintiffs in the case.  At the outset, counsel had to process opt-in applications for more than 15,000 police officers and detectives – nearly half of the uniformed individuals in the entire NYPD.  Since then, counsel have met with countless plaintiffs and provided contemporaneous updates on the status of the case, and have notified them, through mailings, emails and phone calls, as circumstances in the litigation required.  As defense counsel frequently reminded the Court, there are no "absent" class members as there may be in an action under Rule 23, and counsel therefore had to devote considerable resources to fulfill our responsibilities to our clients.

### b.     Defeating defendants' initial dispositive motions

Shortly after plaintiffs filed the last of the opt-in forms, defendants moved for an order of "conditional" dismissal of the Regular Rate and Chart claims, on the theory that if plaintiffs turned out to be unable to prove that their meal periods were spent predominately for the City's benefit, then defendants would be entitled to a credit for those meal hours of such magnitude that it would wipe out any potential recovery.  Plaintiffs' counsel successfully opposed that motion, and later defeated the "meal period" defense in its entirety.  Doc. 147, Opinion and Order (Dec. 28, 2004).[2]

### c.     The survey and motion practice before Magistrate Judge Katz

In mid-2004, the Court directed the parties to develop and administer a statistical survey of plaintiffs in lieu of permitting defendants to take discovery from each and every one of the plaintiffs

---

[2] Plaintiffs also successfully opposed defendants' motion to dismiss Count I of the amended complaint – the "denial of use" claim – and defendants' motion to join the PBA and DEA as necessary parties under Rule 19.  Doc. 117, Opinion and Order (June 23, 2004).

6

in the case. Because of disagreements between the parties as to what questions should be included in the survey, how they should be phrased, how the survey should be administered, and who the respondents should be, the process took years to complete. Following the Court's order, plaintiffs drafted the initial version of the survey and circulated it to defendants in December 2004. Throughout the spring of 2005, the parties corresponded on revisions and retained experts to help them develop the survey – a process that continued when discovery disputes were referred to Magistrate Judge Katz in June of 2005. From the outset, the survey covered virtually all aspects of the lawsuit, including – at defendants' insistence – a raft of questions relating to how respondents spent their meal periods, and what burdens (if any) were imposed on them during those meal periods.

In fall 2005, the parties agreed to administer the survey in phases, the first of which would be a 50-person "pretest" designed to ensure that the survey itself worked correctly. The parties solicited bids from six nationally recognized survey firms, and selected SRBI from among the competing bidders.[3] SRBI administered the first pretest in January 2006, and a second pretest, which included additional and revised questions in November and December of that year. The parties agreed in February 2007 to a final version of the survey, which was not completed until January 2008.

Plaintiffs wrote to and appeared before Magistrate Judge Katz and this Court numerous times during the painful 3 1/2-year life of the survey process, each time seeking orders directing defendants either to allow plaintiffs to include certain lines of questions defendants did not want asked, or else just to order defendants to respond to our attempts to move the process forward. We do not here catalogue the record of those efforts (although we easily could do so if the Court requests it); suffice

---

[3] The parties have split SRBI's fees, 50-50.

it to say that plaintiffs' counsel worked persistently to complete the survey process as quickly and efficiently as possible. The hours we were forced to devote to that process are reasonable.

### d.    Document and deposition discovery

In addition to the survey, both parties engaged in extensive discovery, virtually *all* of which pertained either in whole or in part to the Regular Rate and Chart claims on which plaintiffs ultimately prevailed.

**(i) Depositions.** Plaintiffs deposed 20 City and NYPD officials, some more than once; indeed, we deposed John Kanganis, defendants' Rule 30(b)(6) witness, on three separate occasions. These depositions spanned all five claims brought in the case, and were critical to class-wide success on the regular rate and chart claims, as well as to the cap claims on which two plaintiffs proved liability. See 11/13/07 Kanganis Tr. (discussing manpower and excusal policies); 2/28/08 Kanganis Tr. (discussing, among other things, whether City compensates for charts in which officers work more than 171 hours in a 28-day period, and nature and causes of mandatory versus voluntary overtime); 3/31/08 Kanganis Tr. (discussing meal period policies and chart policies). Likewise, each and every borough commander was asked questions about the cap claim and meal periods. See 12/11/06 McCarthy Tr. at 68-73, 96-99; 1/4/07 Smolka Tr. at 22-54, 84-91; 3/26/07 Fox Tr. at 19-57, 74-80; 3/28/07 Dale Tr. at 12-30, 36-38; 5/14/07 Nelson Tr. at 10-36, 53-54.

Plaintiffs also *defended* 37 depositions of individual Representative Plaintiffs. At each and every one of these depositions, defendants' counsel quizzed the officer or detective about their meal periods. The examination typically included questions about how often he or she received a meal, how often it was interrupted, the restrictions placed on him or her during the meal, and a host of others. Defense counsel commonly made exhibits of the deponent's memo books, and asked the

8

deponent to "walk" counsel through some portion of the memo books to explain events and notations concerning meal periods.

**(ii) Document discovery.** Plaintiffs drafted and served five document requests, and carefully reviewed the approximately 120,000 non-indexed pages of discovery produced in response.  We were constrained to issue five separate requests because, as discovery progressed, it became evident that responses to previous requests had been materially incomplete.  Plaintiffs repeatedly moved to compel production before Magistrate Judge Katz, who in each instance ordered the documents produced.  In numerous cases, however, the documents were *not* produced, and we thus were forced to return to Judge Katz again, seeking the same relief.  None of our efforts in this regard were unreasonable.

At the same time, in response to defendants' discovery requests, plaintiffs' attorneys contacted 196 individual Representative Plaintiffs and collected, photocopied, and produced nearly 200,000 pages of documents from them.  This effort required months of perseverance and dedication not only from the attorneys themselves – who had to respond to many plaintiffs' stated fears of reprisal and concerns about turning over documents that officers were under explicit orders not to relinquish – but also from support staff hired specifically to assist with the effort.  This was a substantial burden, particularly because the overwhelming majority of the responsive documents came were the officers' "memo books," documents that *belonged* to the police department and that defendants could thus have collected themselves.  See Feb. 21, 2008 Hearing Tr. at 32-33 ("THE COURT: * * * I happen to believe you could have had the memo books on a dime if you wanted them.  I don't think you wanted them.  I think you want to delay.  You could have gotten them by ordering the police officers to produce the memo books to their supervisors.  That is what I think.").

9

In the end, the only use that defendants made of the memo books was to attempt to show that officers and detectives typically do not spend their meal periods substantially for the benefit of their employer, and that defendants therefore should be entitled to a meal period credit to offset plaintiffs' regular rate and chart claims. The meal period defense failed, of course, but defendants cannot now plausibly claim that the enormous time and expense we devoted to responding to defendants' meal-period-related document requests were not reasonable.

**(iii) Other written discovery.** In December 2006 – *at defendants' request* – plaintiffs drafted and served a set of proposed stipulations designed to limit the number of depositions necessary. Defendants responded to these proposed stipulations three months later, in March 2007, verbally representing that about half were unacceptable. Plaintiffs therefore recast the "disputed" stipulations as Requests for Admission, but many responses violated Rule 36(a)'s mandate that "a denial shall fairly meet the substance of the requested admission." After months of back-and-forth in which defendants declined to supplement their response, plaintiffs moved for sanctions. Jan. 14, 2008 Ltr. from Orseck to M.J. Katz. On January 25, 2008, Magistrate Judge Katz deemed certain disputed Requests to be admitted, and ordered proper responses to the remainder. Defendants, however, still refused to provide appropriate responses, constraining us to raise the issue in court yet again, this time before your Honor in the February 21, 2008 conference. See Feb. 21, 2008 Hearing Tr. at 47 ("THE COURT: Deemed admitted. That is it. We are done with that question."). Our efforts regarding these Requests for Admission were protracted, for certain, but they were entirely necessary and ultimately successful.[4]

---

[4] Plaintiffs also drafted and served two sets of interrogatories that covered all the claims and defenses in the case.

10

(iv) **Payroll Records.** One of the most challenging – and crucial – aspects of the case has been to obtain millions of individual payroll records from NYPD computers, decode them, and analyze them to determine both liability (for the Regular Rate and Chart Time claims) and damages (for all five claims). To say that the NYPD payroll system is Byzantine would demean an ancient civilization, and it has taken literally years of working with defendants and our damages expert to understand it. A chief difficulty is that the payroll records for a given officer do not amount simply to a spreadsheet showing such things as hours scheduled, hours worked, and rate of pay; instead, there are six discrete files for each officer – each so enormous that traditional office computers cannot open it – and one must reconcile entries in multiple files in order to answer even the most basic questions about an officer's work and pay. See Simpson Rpt. at 7-10.

What is more, the entries in each payroll file are impenetrable without a clear understanding of the "payroll code" assigned to each one. There are hundreds of such codes, each with a precise function, but there is no Rosetta Stone explaining how each is used, nor – despite our many requests – have defendants ever been able to identify an individual with comprehensive knowledge of the system. Instead, plaintiffs and their expert engaged in a years-long effort to get answers from defendants about the meaning of the codes and their use. That effort included repeated trips to Judge Katz (June 28, 2005; Sept. 5, 2007), and this Court (May 5, 2007; December 20, 2007).

### e.    Summary judgment motions

In the lead-up to trial, plaintiffs filed a motion for partial summary judgment, and won summary judgment as to liability on the Regular Rate and Chart claims, and also won summary judgment as to the City's meal-period affirmative defense. See doc. 216, Opinion and Order (Aug. 28, 2008), at 43 ("[T]he undisputed facts demonstrate that an agreement existed to treat officers'

meal periods as work time."). Plaintiffs also successfully opposed defendants' cross-motion for summary judgment, which was denied in its entirety. *Id*. Plaintiffs then filed a motion for reconsideration as to damages on the regular rate and chart claims, upon which the Court requested supplemental briefing on the availability of other credits that defendants had not specified in their summary judgment briefing. Plaintiffs were victorious. See Doc. 269, Opinion and Order (Nov. 13, 2008) (granting plaintiffs' motion for reconsideration and holding that semi-annual holiday payments are not creditable against FLSA obligations).

Cross-briefing continued throughout the trial and afterward on numerous newly raised credit theories that defendants had not asserted in response to plaintiff's summary judgment motion. See, *e.g.*, Doc. 276, Mem. Opinion and Order (Dec. 2, 2008) (holding that premium portion of double payment for working on scheduled vacation day is neither credited against FLSA obligations nor included in the regular rate calculation). Again, all of these efforts were plainly necessary for plaintiffs to prevail on the Regular Rate and Chart claims.

### f.    The trial

Not surprisingly, the trial itself required a substantial expenditure of resources, both in terms of costs and attorney time. During the two weeks of trial itself, plaintiffs prepared and put on 18 witnesses, two of whom were experts, and cross-examined defendants' witnesses, all while continuing to brief the many novel legal issues that arose concerning interpretation of the FLSA. And even after the jury returned, the parties continued to disagree about damages – a process that concluded only this month.

*        *        *

In sum, the "time and labor required" to prosecute this action (*Johnson*, 488 F.2d at 717) more than warrant the fees and expenses sought.

### 2.    The novelty and difficulty of the questions

As the *Johnson* court explained, "[c]ases of first impression generally require more time and effort on the attorney's part. Although this greater expenditure of time in research and preparation is an investment by counsel in obtaining knowledge which can be used in similar later cases, he should not be penalized for undertaking a case which may 'make new law.' Instead, he should be appropriately compensated for accepting the challenge." 488 F.2d at 718.

As this Court is well aware, this case presented *nothing but* issues of first impression, and many especially difficult ones at that. See, *e.g.*, Nov. 26, 2008 Trial Tr. 2327 ("[The Second Circuit has] got a million decisions to make. How many of these issues were first impression? Many, many, many. How many of this charge was first impression? All."). Never has an FLSA case of this size been brought against a municipality, and most of the claims had never before been tried to a jury. Thus, from the construction of the survey – itself a relatively novel undertaking as a discovery device – to the availability of meal period credits, holiday credits, and vacation pay credits, to the formulation of the jury charge, this case has presented complex issues seldom confronted by federal courts. The damages questions, too, were ones of first impression: No court had ever before considered the proper measure of damages for the "15 Minute" claim or for Forced Accrual, and the proper measure of damages for Denial of Use was likewise unsettled.

Finally – but hardly least – the fundamental question whether the FLSA's "reasonable period" requirement requires the employer to grant *the precise* day requested, or merely a day *reasonably close* to it, is unsettled. Compare *Mortensen* v. *County of Sacramento*, 368 F.3d 1082,

1090-91 (9th Cir. 2004) (FLSA does not require employer to grant specific date requested), and *Houston Police Officers' Union* v. *City of Houston*, 330 F.3d 298, 303 (5th Cir. 2003) (same), with 29 C.F.R. § 553.25 (interpreting FLSA to require employer to grant specific date requested unless undue disruption would result), and *Heitmann* v. *City of Chicago*, 560 F.3d 642 (7th Cir. 2009) (deferring to the DOL regulation).  This Court's 2004 opinion, which adopted the view of the Fifth and Ninth Circuits and rejected the DOL's interpretation, dictated the course of years of subsequent litigation.    Plaintiffs respectfully submit that they fully engaged each of these difficult questions with rigor, perseverance, and creativity, a consideration that supports our fee request.

### 3.    The level of skill required to perform the legal service properly

In determining a reasonable fee, "[t]he trial judge should closely observe the attorney's work product, his preparation, and general ability before the court.  The trial judge's expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration." *Johnson*, 488 F.2d at 718.  We respectfully submit that, throughout this litigation, plaintiffs's counsel provided top-tier advocacy, both written and oral, on complex legal and factual issues.  Counsel have been well prepared at all times, and have presented our positions clearly and forcefully.

### 4.    The preclusion of employment by the attorney due to acceptance of the case

"This guideline involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes." *Id.*  The large number of hours dedicated to this case have most certainly precluded

work on other matters. Attorneys and staff from Aitchison & Vick have dedicated 11,088.97 hours to the case, and those from Robbins Russell have spent 6,691.25 hours – all or most of which time might have been billed elsewhere.

### 5.    The attorney's customary hourly rate

The fifth *Johnson* factor adopted by the Second Circuit is the customary hourly rate of the prevailing attorneys. *Arbor Hill*, 522 F.3d at 186 n.3. The Second Circuit has recognized that, when a case runs for a period of years, the question naturally arises which hourly rate to use – the one that prevailed when the case was filed, or the one in effect at its termination. It recognized that, in their pure forms, "[n]either historic nor current rates are ideal." *New York State Ass'n for Retarded Children, Inc.* v. *Carey*, 711 F.2d 1136, 1152 (2d Cir. 1983). "[H]istoric rates do not reflect inflation or the cost of forgone interest, and, therefore, undercompensate prevailing parties," and although current rates do incorporate those factors, "the incorporation is imprecise and can overcompensate the prevailing parties." *Id.* The Second Circuit therefore advises district courts "to divide the litigation into just two phases and use one rate for the early phase and a current rate for the later phase. *Id.* at 1153; see also *Grant* v. *Martinez*, 973 F.2d 96, 100 (2d Cir. 1992) (same); *In re Painewebber Ltd. Partnerships Litigation*, No. 94 Civ. 8547 (SHS), 2003 WL 21787410, at *3 (S.D.N.Y. Aug. 4, 2003) (dividing 6-year litigation period into two 3-year periods, and using "[h]istoric" rate for years 1-3, and "current" rate for years 4-6).

Just as in *In re Painewebber*, this litigation was pending for approximately seven years, from 2002 through 2009. Accordingly, as in that case, we have divided the period into two blocks of roughly 3 years each (2002-2005 and 2006-2009), and computed the fees for each period using the attorneys' standard hourly rates prevailing at its end. See Exhibits A and B to the Declaration of

15

Gary A. Orseck, attached hereto (Robbins Russell's billing summary and contemporaneous billing records), and Exhibits A and B to the declaration of William Aitchison (Aitchison & Vick's billing summary and contemporaneous billing records).

### 6.    Whether the fee is fixed or contingent

The Fifth Circuit in *Johnson* next reasoned that a district court can look to a fee agreement to help determine what the attorneys' expectations were, as a means of measuring the value they attached their own time. *Johnson*, 488 F.2d at 718.  Plaintiffs' counsel in this case agreed to be compensated through a shared 25% contingent share of the total recovery minus costs, plus any fees awarded by the Court. Given the magnitude of the case and the consistency with which courts have compensated successful attorneys at their prevailing hourly rate (see cases discussed below), plaintiffs had a reasonable expectation that their standard hourly rates would be awarded here.

### 7.    The time limitations imposed by the client or the circumstances

Courts reason that "[p]riority work that delays the lawyer's other legal work is entitled to some premium." *Johnson*, 488 F.2d at 718.  Although (as discussed above) this case took years to conclude, much of it – including the entirety of the last year – was conducted under an expedited and intense schedule.   The press of work required to litigate this case successfully displaced many competing obligations of counsel.

### 8.    The amount involved in the case and the results obtained

(i)  The case included five claims.  Plaintiffs won summary judgment on liability as to two of the claims, and, at trial, persuaded a jury that defendants – who run the largest police department in the country – committed those violations willingly.  We also proved liability as to two individual plaintiffs on the "cap" aspect of our forced-accrual claim, thus creating a valuable precedent on a

legal theory that thousands of other officers are now able to pursue if they wish.  Finally, we succeeded in defeating defendants' good-faith defense, meal-period defense, and myriad claims for credits against FLSA liability.  For these successful claims, plaintiffs' attorneys have won $900,000 in damages for their clients.

To be sure, plaintiffs did not prevail on all of their claims – but that is neither unusual nor an indication that an award of the "lodestar" amount is inappropriate.[5]  Although degree of success can affect a fee award under federal remedial statutes (*Hensley*, 461 U.S. at 434), courts sensibly recognize that "counsel's time will [often] be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Id.* at 435.[6]  Thus, "[s]o long as the plaintiff's unsuccessful claims are not 'wholly unrelated' to the plaintiff's successful claims, hours spent on the unsuccessful claims need not be excluded from the lodestar amount."[7]

---

[5]  The Supreme Court has made clear that there is "strong presumption that the lodestar [figure] represents the reasonable fee" (*City of Burlington* v. *Dague*, 505 U.S. 557, 562 (1992)), and "[t]he party advocating * * * a departure [from the lodestar] * * * bears the burden of establishing that an adjustment is necessary to the calculation of a reasonable fee" (*Grant* v. *Martinez*, 973 F.2d 96, 101 (2d Cir. 1992)).

[6]  The same standard applies to claims for attorney's fees under the FLSA and § 1988.  See *Hensley*, 461 U.S. at 433 n.7 ("The standards set forth in this opinion [construing § 1988] are generally applicable in all cases in which Congress has authorized an award of fees to a prevailing party."); *Gordon* v. *Camp Canine, Inc.*, No. 02 Civ. 4093 (SAS)(JCF), 2003 WL 1563288, at *2 (S.D.N.Y. March 25, 2003) ("In determining the [FLSA fee] award, courts utilize the analytical framework for civil rights cases under 42 U.S.C. § 1988."); *Ayres* v. *127 Restaurant Corp.,* No. 96 Civ. 1255, 1999 WL 328348, at *1 (S.D.N.Y. May 21, 1999) ("[T]he law on attorneys' fees is no different in FLSA cases than it is in employment discrimination cases.").

[7]  *Lunday* v. *City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994) (citation omitted).  See also *Clarke* v. *One Source, Inc.*, No. 99 Civ. 2323 (RPP), 2002 WL 31458238, at *6 (S.D.N.Y. Nov. 1, 2002) ("An attorney is entitled to recover for time spent working on both the successful claims and the intertwined unsuccessful claims * * * .  In this case, although Plaintiff was successful on only one of seven legal claims, all claims were part of a common core of facts such that it is impossible to allocate the attorney's time to each of the separate theories."); *Grant* v. *Martinez*, 973 F.2d 96,

17

In this case, it is virtually impossible to separate the hours dedicated to the Denial-of-Use and Failure-to-Pay claims, on the one hand, from those spent on the Forced-Accrual, Chart, and Regular-Rate claims, on the other.   Although certain isolated discovery requests were directed, unsuccessfully, toward obtaining records of comp time grants and denials, the overwhelming majority of hours spent during discovery were applicable to all of the claims.  The trial, too, implicated each claim, as the testimony of both plaintiff and defense witnesses was necessary to prove that defendants violated the law willingly, and without good faith.  Hours dedicated to each of these tasks – which account for almost *all* of the hours in the case – were thus spent in direct support of claims on which plaintiffs prevailed.

(ii) Nor is there any requirement that attorney's fees should be determined as a function of the damages awarded; indeed, they may, and often do, exceed the damages awarded by orders of magnitude.  See *City of Riverside* v. *Rivera,* 477 U.S. 561, 578 (1986):

> A rule of proportionality [between damages and attorney's fees] would make it difficult, if not impossible, for individuals with meritorious civil rights claims but relatively small potential damages to obtain redress from the courts. * * * In order to ensure that lawyers would be willing to represent persons with legitimate civil rights grievances, Congress determined that it would be necessary to compensate lawyers for all time reasonably expended on a case.

On that reasoning, the Second Circuit and courts within it have routinely approved fee awards substantially higher than the actual damages awarded.  See, *e.g.*, *Lunday*, 42 F.3d at 135 (approving fee award of $115,000 where plaintiffs won $35,000 in damages); *Grant*, 973 F.2d at 98 (approving fee and cost award of $513,000 for $60,000 settlement); *Cowan* v. *Prudential Ins. Co. of America*, 935 F.2d 522, 523 (2d Cir. 1991) (reversing district court that reduced $54,000 fee lodestar to

---

101 (2d Cir. 1992) (observing that "all of appellees' claims were based on a common core of facts").

$20,000 because damages were only $15,000); *Barfield,* 2006 WL 2356152, at *3 (awarding $887.25 in unpaid wages, $887.25 in liquidated damages, and $49,889 in attorney's fees); and *Clarke*, 2002 WL 31458238, at *6 (awarding $77,000 in fees on top of a $55,000 judgment).

In light of these precedents, the relationship between the award won ($900,000) and fees requested (approximately $4.8 million ) in this case is well within the norm.

_____(iii) The fees requested are warranted for the additional reason that the litigation established valuable precedents that will benefit NYPD officers and detectives in the future. By their own admission, the City of New York and NYPD have until now considered meal periods not to be "work" for FLSA purposes. In any future dispute with a police officer over hours worked, such a position will be legally untenable, and all FLSA rights that attach to "work" time will be much more readily asserted in the meal period context.

Similarly, by this Court's order (Doc. 216, Aug. 28, 2008), the NYPD is now on notice that it may not order officers to select comp time for overtime that they are ordered to work. The jury found that the NYPD in fact engages in this practice – at least with respect to two of the named plaintiffs whose "cap" claims it was permitted to consider – and one hopes the NYPD is now less likely to do so in the future. These are benefits that are not directly reflected in the jury's award of damages, but are valuable to NYPD officers and detectives nevertheless.

### 9.     The experience, reputation, and ability of the attorneys

The Court also should consider the experience, reputation, and ability of the attorneys requesting the fee award. 488 F.2d at 718-719. The hourly rates that plaintiffs seek (see Exhibits A and B) are more than reasonable given their experience, which is described below.

_____Thomas Puccio, the counsel of record, is a former Chief of the Criminal Division of the Office of the United States Attorney for the Southern District of New York, and is one of the most well known, successful, and experienced trial attorneys in the City of New York.

_____Gary Orseck is a founding partner and the Managing Partner of Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, a well-known litigation boutique with a national practice.  Mr. Orseck has twenty years of experience practicing in federal courts, both at the U.S. Department of Justice and in private practice.  He has served as lead or co-lead counsel in numerous federal class actions, and in complex commercial matters of all types.

William Aitchison is a name partner with the labor law firm Aitchison & Vick, and has approximately thirty years of experience specializing in both plaintiff- and defense-side labor litigation.  He has successfully represented plaintiffs' classes in suits against municipalities throughout the country, and is regularly a featured speaker at labor law conferences.  Mr. Aitchison is also the author of THE FLSA: A PRACTITIONER'S GUIDE, a treatise now in its fourth edition.

Damon Taaffe is associated with Robbins, Russell, Englert, Orseck, Untereiner & Sauber, and has been in private practice for six years.  Before joining Robbins Russell, he graduated with honors from The Law School at the University of Chicago, where he was a moot court finalist and Articles Editor of the Law Review, and clerked for then-Chief Judge Edward R. Becker on the United States Court of Appeals for the Third Circuit.  Since joining Robbins Russell, Mr. Taaffe has written approximately thirty briefs for federal courts of appeals and the United States Supreme Court, drafted myriad motions for cases in district courts, including three successful summary judgment motions, and overseen extensive discovery obligations in the present case and others.

20

_____The experience, reputation and ability of plaintiffs' counsel supports an award of the requested fees.

### 10.    The undesirability of the case

Courts also take into account possible negative professional repercussions from representing individuals who assert civil rights claims. *Johnson*, 488 F.2d at 719. That factor is not a material concern under the facts of this case.

### 11.    The nature and length of the professional relationship with the client

The Fifth Circuit next observed that "[a] lawyer in private practice may vary his fee for similar work in the light of the professional relationship of the client with his office." *Id.* The present case, however, is not one with an institutional client; rather, it involves representing thousands of individuals, none of whom has previously been represented by plaintiffs' attorneys.

### 12.    Awards in similar cases

Finally, "[t]he reasonableness of a fee may also be considered in the light of awards made in similar litigation within and without the court's circuit." *Id.* Assessing a fee award in this case by reference to other cases is difficult because there are virtually no cases of similar scope and complexity in the labor context. However, it is clear that the hourly rates plaintiffs request are consonant with rates that courts in the Second Circuit have approved for high-profile work by firms of national reputation, which all three plaintiff firms possess. See, *e.g.*, *United States* v. *Donaghy*, 570 F. Supp. 2d 411, 432 (E.D.N.Y. 2008) (amounts from $600-$750 per hour for partners, and $380-$580 for associates, "are in line with the rates charged by most of New York City's major corporate law firms." *See also* also *Miele v. New York State Teamsters Conf. Pension & Retirement*

*Fund,* 831 F.2d 407, 409 (2d Cir.1987) (district court may rely on its own knowledge of hourly rates in the market).

The hourly rate requested by plaintiffs' in this case, if anything, reflects a substantial discount from amounts that courts have previously approved for their services. For example, in the past year, Mr. Orseck and Mr. Taaffe have performed substantial work representing a creditor's committee in *In re TOUSA, Inc.*, No. 08-10928-JKO (S.D. Fl.). In that case, the bankruptcy court has, as a matter of public record, approved fees of $675 per hour for Mr. Orseck, and $510 per hour for Mr. Taaffe. The fees requested in this case represent a substantial discount – approximately 25% – from those judicially approved fees.

*    *    *

In sum, under the consider-all-factors approach adopted by the Second Circuit in *Arbor Hill,* 522 F.3d at 182, the fees and costs plaintiffs seek are appropriate.

## II.    THE COURT SHOULD AWARD PLAINTIFFS THEIR COSTS

Section 216(b) of the FLSA, 29 U.S.C. § 216(b), states clearly that, in addition to "a reasonable attorney's fee," the court "shall * * * allow * ** costs of the action." As broken down in Exhibits A and B, plaintiffs request $677,567.51 in costs, an amount that is plainly warranted given the duration, scope, and complexity of the action.

Of the amount requested, approximately $275,000 represents miscellaneous expenses incurred over seven years of litigation and trial, including travel (all of the undersigned attorneys practice outside New York City), copying, postage, deposition transcripts, and vendor support.

The lion's share of plaintiffs' expenses – more than $400,000 – was incurred through their retention of experts indispensable to the prosecution of the case. Both above and in many prior

22

briefings in this Court, plaintiffs have described the protracted and arduous process of negotiating, drafting, testing, revising, and conducting the survey of a sample of plaintiffs as a substitute for defendants' usual means of discovery.  Two of plaintiffs' experts – The Analysis Group and Dr. Thomas G. Guterbock – spent literally years, at very reasonable rates, to ensure that the survey was conducted in a scientifically valid manner while capturing information vital to the case.

Plaintiffs' third expert, Dr. Murray S. Simpson, is by now doubtless familiar to the Court. He was the individual tasked with deciphering the inner workings of defendants' payroll system, a task that, with his trial testimony, required more than a thousand hours.  Dr. Simpson's tireless efforts were absolutely critical to plaintiffs' summary judgment victory on their chart and regular rate claims, both of which violations he effectively proved through his calculations.

Finally, Plaintiffs' fourth expert, Dr. John Eterno, testified at trial with respect to cultural enforcement of behavioral norms within the law enforcement community.  Although his testimony was discrete, it was crucial to plaintiffs' explanation of why, in many cases, they did not formally challenge improper actions taken by their supervisors.

Each of these experts was effective and justified; the costs for their services should be recovered, along with costs for more routine logistical steps.

## CONCLUSION

For the reasons stated above, plaintiffs respectfully request that the Court award them $4,849,171.40 in attorney fees, and $677,567.51 in costs, for Robbins Russell and Aitchison & Vick. Mr. Puccio's fees and costs will be submitted separately.

Respectfully submitted,


  /s/ Gary A. Orseck           
Thomas P. Puccio
LAW OFFICES OF THOMAS P. PUCCIO
230 Park Avenue
New York, NY 10169
(212) 883-6383

Gary A. Orseck (admitted *pro hac vice*)
Lawrence S. Robbins (LR-8917)
Damon W. Taaffe (admitted *pro hac vice*)
ROBBINS, RUSSELL, ENGLERT,
 ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411
Washington, D.C. 20006
(202) 775-4500

Will Aitchison
AITCHISON & VICK, INC.
3021 N.E. Broadway
Portland, OR 97232
(503) 282-6160


Date:   June 30, 2009                     *Counsel for Plaintiffs*